Sixth Division
January 21, 2011

No. 1-07-2969

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court |
| | ) | of Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 04 CR 17327 |
| | ) | |
| DAMEN TOY, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | James Michael Obbish, |
| | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Garcia and Justice R.E. Gordon concurred in the judgment and opinion.

## OPINION

Following a May 2007 jury trial, defendant Damen Toy, who appeared *pro se* at trial, was convicted of two counts of aggravated criminal sexual assault with a firearm and two counts of attempted armed robbery. Defendant was subsequently sentenced to a 45-year term for one count of aggravated criminal sexual assault and a consecutive term of 30 years for the second count of aggravated criminal sexual assault, as well as two concurrent terms of 10 years for the two counts of attempted armed robbery, for an aggregate term of 75 years' imprisonment.

Defendant appeals, arguing that: (1) his waiver of counsel was not valid because the trial court did not give him oral admonishments about the potential range of sentences; (2) his conviction for attempted armed robbery should be reduced to simple robbery because the State failed to prove that he was armed with a "dangerous weapon"; (3) the State failed to prove that defendant possessed a "firearm" within the meaning of the aggravated criminal sexual assault statute (720 ILCS 5/12-14(a)(8) (West 2004)); and (4) defendant was denied the right to a fair

sentencing hearing and the right to counsel because the trial court refused to appoint the public defender at the sentencing stage of the proceedings.

In July 2004, defendant was charged with the aggravated criminal sexual assault of B.H. and the attempted armed robbery of B.H. and Paul Watkins-Lash. In August 2004, the public defender was appointed to represent defendant in this case and in other separate pending cases.

On October 25, 2005, defendant's attorney informed the trial court that defendant wished to represent himself. The trial court noted that defendant had "four cases before the Court, three of which are Class X felonies, two of them are aggravated criminal sexual assault allegations with numerous counts, armed robbery, attempted armed robbery, burglary, another separate and distinct armed robbery with an aggravated unlawful restraint." The court then asked defendant if he understood all the charges pending before the court. The trial court then warned defendant about his decision to represent himself as follows.

> "You have a constitutional right to represent yourself.
>
> Before I admonish you as I'm required to do under Illinois Supreme Court rules, I also find it incumbent upon myself to explain to you that if you do decide to represent yourself, you will be required to follow all the rules and procedures that every lawyer who steps into this courtroom must follow. I will not have the opportunity to teach you the law nor explain to you the procedures which also encompass the rules of evidence.

And having said that, it's clear to me that you will be at a distinct disadvantage; so I really wonder out loud why in the world you would want to represent yourself against trained

prosecutors who are probably salivating for the opportunity to try the case and get someone who does not know the rules of evidence or courtroom proceeding. They will have a distinct advantage.

The law does provide and our Constitution does provide you the opportunity to represent yourself. That alone doesn't mean that that's an intelligent decision."

Defendant stated that he was not getting the counsel that he "deserve[d]." Defendant indicated that he had been in jail for 17 months and his attorney did not have a defense for him while the State was "putting a lot of effort in the case." Defendant's attorney then noted that defendant had new cases that have arisen. In response, defendant said, "I don't understand why Mr. Thomas is speaking before you. He no longer represents me." The court informed defendant that it would have its clerk make copies of all the charges and the minimum and maximum possible sentences and give defendant the opportunity to read them. The court again advised defendant about the risk of representing himself at trial.

At the next status hearing on October 31, 2005, the trial court asked defendant if he still wished to represent himself and defendant responded that he did. The trial court informed defendant that it was going to give him a copy of four separate indictments and "a typewritten copy of all the possible sentences, each count on each separate indictment, and how they may or may not be consecutive, not only to each other within each separate indictment, but how the sentences could be consecutive to each other, that the separate indictment – separate cases could be consecutive to each other. There's a lot of different possible sentences."

Defendant continued to assert that he "can't get a lawyer to help defend my case." The

trial court continued to warn defendant about representing himself.

> "The reason that – the reason why we are giving you all of this is because you want to represent yourself, and that is the reason why you have to receive all the information, and, yes, it is a lot of information to read and to comprehend. That's why I am putting it in writing for you so that you could read it, examine it, and then I will address you in open court and explain to you all the possible penalties and sentences on the indictment on the next short court date."

The court told defendant to review the indictments and sentences and speak with his attorney before making a final decision.

On November 7, 2005, defendant informed the trial court that he did not want to represent himself. Later, on January 4, 2006, defendant told the trial court he was not happy with his attorney because his attorney had not been to meet with him in jail. Defendant's attorney stated that defendant asked him to ask the prosecutor about an offer for a plea and the prosecutor gave him that offer that day. The trial court explained to defendant his attorney just stated in court that he just received the information. Defendant continued to complain that his attorney had not visited him, despite the trial court's repeated discussion that his attorney did not have the necessary information from the State. The court asked defendant if he wanted to represent himself and defendant said no, he did not. At the next status hearing on January 26, 2006, defendant's attorney informed the trial court that he met with defendant for "about one hundred minutes" and needed to talk to defendant again.

4

On February 28, 2006, defendant's attorney informed the trial court that defendant asked him to withdraw from defendant's case and for defendant to represent himself. The trial court asked defendant if this was "accurate" and defendant responded in the affirmative. The court checked that defendant had been provided a written explanation of all the charges and sentences and defendant confirmed that he had received it. The prosecutor stated that the possible sentences were "58 years minimum, 202 years maximum" due to consecutive counts and charges. Defendant's attorney also noted that defendant received an offer of 40 years, but he declined the offer. The trial court again told defendant he had the right to a lawyer provided free of charge from the state and asked if defendant wished to terminate that representation and represent himself. Defendant answered, "Yes, I do." The court then admonished defendant that he would be at a disadvantage because he is not trained in the law and that the court cannot teach defendant about the rules of evidence or act as his lawyer. The court told defendant that he would be treated like the other lawyers and would be presumed to know procedural and substantive rules. After this admonishment, the trial court asked defendant what his decision was and defendant replied, "Your Honor, I choose to represent myself."

The State then informed the court that it was electing to prosecute defendant on case number 05 CR 16845, an armed robbery charge. That trial occurred in September 2006, and the record indicates that it resulted in a mistrial without prejudice. In September 2006, the State then elected to prosecute defendant under the instant case. The prosecutor asked defendant if he still intended to represent himself, and defendant answered, "Yes, I do."

At the next status hearing on October 12, 2006, the prosecutor indicated on the record that it was filing "an official notice of the charges and the punishments and possible penalties that

can be carried upon if there is a conviction based on any of the charges as they currently stand." The trial court stated that it was a two-page document and defendant would be provided a copy. The court told defendant to "please make sure your read that and review that. If you don't understand anything that's contained in the explanation of all the possible sentences that can result from a conviction of any one of those counts, on the next court date make notes and ask questions."

At the next court date on November 14, 2006, the case appeared before a new trial judge, who continued on the case and presided over defendant's trial. Defendant presented motions to the court, but did not ask any questions regarding the document he received at the previous hearing concerning the charges and possible sentences. Defendant continued to file numerous pretrial motions before the court. In March 2007, defendant filed a motion seeking the assistance of counsel to help with the cross-examination of one witness. The following colloquy took place.

> "THE COURT: If you no longer want to be representing
>
> yourself, you are going to have appointed counsel. You need to tell
>
> me that. You can't of ask [*sic*] for a lawyer to come in and just for
>
> a little bit of a piecemeal part of the case. That's not going to
>
> happen. You've gone through an extensive amount of questioning
>
> by Judge Simmons assisting that you were capable and wanted to
>
> represent yourself. You can't have just a little bit of a lawyer. You
>
> either have a lawyer who represents you or represent yourself.
>
> That's your choice.
>
> THE DEFENDANT: I choose to represent myself, Your Honor."

Defendant's case then proceeded to trial with defendant appearing *pro se*. The following evidence was presented at the May 2007 jury trial.

In the early morning hours of June 27, 2004, B.H. and Paul Watkins-Lash were sitting on the porch of B.H.'s house, located at 2415 W. Pensacola in Chicago. Watkins-Lash went to a nearby gas station to buy cigarettes and walked back to B.H.'s house. B.H. noticed a man walking behind Watkins-Lash. Watkins-Lash rejoined B.H. on the porch. The man walked by the house and then approached them. He asked for a cigarette, which Watkins-Lash gave him along with a lighter. The man left, but returned a short time later. Watkins-Lash stated that the man was "holding a gun cupped in his jacket, like the barrel of the gun. He had the gun out." When asked if there was any doubt in his mind that what the man had was a gun, Watkins-Lash stated, "That was a gun." He said the gun was in front of his face, but pointed down toward the ground. B.H. also testified that the man had a gun. The man then demanded that they give him their money and threatened to kill Watkins-Lash. When they told the man that they did not have any money, he searched through their pockets.

The man then told Watkins-Lash to stay on the porch or he would shoot Watkins-Lash. He took B.H. by her wrist and took her into the gangway between her house and the house next door. He turned her to face the house with her arms up. He told her to remove her pants, but then removed them himself. B.H. testified that the man's penis entered her vagina and his penis also touched her anus, but did not enter it. During the sexual assault, B.H. felt something in the back of her head. She assumed that it was the gun because the man was threatening to kill her.

Eventually, Watkins-Lash left the porch and came around to the gangway. When he saw that B.H. was being sexually assaulted, he yelled at the man. The man stopped and turned to run

away. B.H. tried to tackle the man, but he smacked her and ran away. They went into B.H.'s house and woke her parents. They called the police and B.H. was taken to Swedish Covenant Hospital. A sexual assault kit was performed on B.H. B.H. identified defendant in court as the man who sexually assaulted her.

After being told about the sexual assault, B.H.'s father went outside with a flashlight to look for the assailant. He recovered a key chain with a key from his front yard and turned it over to the police.

Christopher Palacios, a neighbor of B.H., heard a scuffle outside and looked out of his window. He saw a white person arguing with a black person. He said the black person ran away in a northwest direction. Palacios never identified defendant in a lineup or photo array, but stated on cross-examination that defendant was the man he saw.

Officer Arcenio Cruz testified that B.H.'s description of her assailant reminded him of a man with whom he had previous contact. At the police station, he pulled a contact card for defendant. Detective Stephen Stratton took the contact card and showed it to B.H. in a photo array with five other photographs. B.H. identified defendant in the photo array. Detective Thomas Ward went to defendant's known address, 2619 W. Agitate, and placed defendant under arrest. Later, Detective Ward tried the key recovered by B.H.'s father on the locks at defendant's residence and testified that he tried the key on the front door, vestibule door and the rear door, and "it all worked." Defendant was put into a lineup. B.H. identified defendant in the lineup, but Watkins-Lash did not make an identification.

The police searched the area between the scene of the crime and defendant's address. They found a Cubs hat and Bulls breakaway pants in a residential garbage can and a blue

windbreaker in a dumpster behind a grocery store. These clothes matched a description given to the police by B.H. DNA was recovered from the Cubs hat and it matched defendant's DNA with a reasonable degree of scientific certainty. A cigarette recovered near the crime scene was also tested, but did not match defendant's DNA. The evidence also showed that no semen was present in B.H.'s sexual assault kit.

Defendant testified on his own behalf. He admitted that the recovered clothes belonged to him, but stated that the clothes were stolen from his gym bag at Shields Park two days before the crime. Defendant attempted to present an alibi defense that he was at home at the time of the crime, but the trial judge told him that he could not put on an alibi defense since he did not notify the State prior to trial.

Defendant presented one witness, Ernest Jones. Jones was defendant's roommate for six years. He stated that he never knew defendant to have a knife, gun or any weapon. He said the police searched their apartment and did not recover a handgun.

In rebuttal, the State presented evidence of defendant's prior conviction for forgery.

Following deliberations, the jury found defendant guilty of two counts of aggravated criminal sexual assault, one for contact between defendant's penis and B.H.'s vagina and the other for contact between defendant's penis and B.H.'s anus, and two counts of attempted armed robbery for B.H. and Watkins-Lash.

In June 2007, defendant filed a *pro se* motion for a new trial. In July 2007, defendant filed a motion for appointment of counsel for sentencing. Defendant indicated that he only wished to have counsel represent him for sentencing and to remain *pro se* on his remaining pending cases. On August 30, 2007, defendant's newly appointed attorney attempted to file a motion for a new

trial, but defendant objected. Defendant stated in court that he asked his attorney not to file the motion because his attorney "has disregarded all the issues that I filed in my previous motion. He has disregarded every item I gave him. He is not complying at least giving me any consideration. His motion is incomplete and it misses a lot of issues that I did write for my motion for a new trial." Defendant then asked for the trial court to appoint different counsel.

The trial court responded that the request for different counsel would be denied. Defendant then stated that he "would like to relieve Mr. Thomas of all responsibility dealing with my case and ask the Court for a 30 day continuance so I can amend my previously filed motion." The trial court told defendant that if it allowed defendant's attorney to withdraw, it would not grant defendant another continuance. The court told defendant that he could argue his motion for a new trial, but defendant said he was not ready. The court admonished defendant about his right to an attorney. The following colloquy then occurred.

> "THE DEFENDANT: Your Honor, this guy sucks. He is a lousy attorney. He is lousy. He does not have my best interest in heart. And if the court forces me to have him deal with my motion, the court will deny it. He has none of my issues in here. I have a 43 page motion.
>
> THE COURT: He is not the issue right now.
>
> THE DEFENDANT: It is the issue because if he doesn't put my issues before the Court, the Appellate Court will not review this motion.
>
> THE COURT: He is not the issue, and your insulting Mr.

Thomas is insulting to everybody in this courtroom.

THE DEFENDANT: I am sorry, but his behavior towards me is insulting.

THE COURT: He is not the issue.

THE DEFENDANT: Yes, he is.

THE COURT: You want to represent yourself?

THE DEFENDANT: I asked the Court to provide me with an attorney to help with my post conviction motion. And provided me with the worst attorney in the building. This guy sucks. He is lousy."

Defendant then swore at the trial judge and his attorney. The trial judge found defendant to be in contempt of court and sentenced him to six months, consecutive to the sentence he would receive on this case. The trial judge then denied defendant's motion for a new trial.

A week later, on September 7, 2007, the trial judge brought defendant to court to follow up after the previous proceedings because he wanted to "make sure that I know what your decision is now that you are acting a little bit more rationally I hope." Defendant complained that his attorney's motion for a new trial contained an inaccuracy and he asked his attorney not to file the motion. Defendant stated that he filed an interlocutory appeal with the appellate court and asked for a continuance until the appellate court ruled. The trial judge said that he would not delay defendant's case "based on your inappropriate procedural attempts." The judge repeatedly asked defendant if he wished to represent himself. Defendant's responses were more complaints about his attorney being unwilling to do what defendant wanted. The judge then offered

11

defendant another opportunity to argue his *pro se* motion for a new trial, but defendant said he was not prepared. The court again denied defendant's motion.

At the next status hearing on September 19, 2007, the trial court recounted that defendant had rejected the efforts of his public defender to represent him and wished to represent himself on his own motion for a new trial. Defendant presented multiple motions including a request for an investigation into judicial misconduct and for an interlocutory appeal. Defendant also asked for a continuance to hire private counsel. The court found that defendant's request for a continuance was not being made in good faith and denied the request. Defendant then asked the court to appoint counsel for sentencing. The court responded as follows.

"THE COURT: That will be denied. I have given you umpteen opportunities to have an attorney, Mr. Toy. You continue to want to play games by hiring and firing them. You had a Public Defender. You abused him, you swore at him, you threatened him.

THE DEFENDANT: I never threatened him. I never threatened him.

THE COURT: You used horribly abusive language toward an individual that was trying to do his job and trying to represent you to the best of his ability and I am not going to allow you to abuse.

I told you when it was – when you said you wanted to fire Mr. Thomas back in August that wasn't – if I allowed it, you were not going to be then allowed to change your mind."

Defendant continued to assert that his family was in the process of hiring him an attorney, but the trial court denied his request for a continuance. Defendant asked for rehearing based on ineffective assistance of counsel, which the court denied. Defendant then asked for a continuance to look into mitigating circumstances, which the court denied.

At that point, the trial court asked defendant to take a seat as the State began to present its aggravating factors at sentencing. The record indicates that defendant then threw "his entire file" at the trial court, but it did not injure the judge; "it brushed aside." The court ordered defendant to be handcuffed. The court told defendant that if he interrupted the proceedings in any way other than by an appropriate objection, he would be removed from the courtroom.

The State then presented multiple witnesses regarding two other cases in which defendant was charged. First, the State presented the testimony of Eric Stubbings. He testified that on February 25, 2004, he was robbed by an armed gunman. The man followed Stubbings home and asked for a cigarette. Stubbings gave him a cigarette and then the man flashed a gun, dropped the cigarette and asked for Stubbings' wallet. Stubbings was unable to identify his assailant, but the cigarette the man smoked was recovered and the DNA matched defendant's DNA.

The second case involved a burglary of the Bailiwick Art Center, located at 1229 W. Belmont. Evidence was presented that money was stolen from the cash register. A fingerprint and blood found on the cash register matched defendant.

The State also presented three certified convictions for aggravated battery, possession of a controlled substance and forgery. The State also read B.H.'s victim impact statement into the record. Defendant did not present any evidence in mitigation. In allocution, defendant continued to claim his innocence, denied that he committed the offenses, and stated that he "made one

13

terrible mistake and that was defending [him]self."

The trial court then sentenced defendant to 45 years on the first count of aggravated criminal sexual assault (penis/vagina contact) and 30 years on the second count of aggravated criminal sexual assault (penis/anus contact), to be served consecutively. The sentences included a 15-year add-on because the jury found that defendant was armed with a firearm. The court also imposed two concurrent sentences of 10 years for the two counts of attempted armed robbery. The 10-year sentences are to be served concurrent to the sentences for aggravated criminal sexual assault. Defendant received an additional consecutive sentence of six months for contempt of court. Defendant received an aggregate sentence of 75 years and 6 months. Defendant filed a motion to reconsider his sentence, which the trial court denied.

This appeal followed.

Defendant first argues that his waiver of counsel was not valid because he was not given the proper admonishments regarding the possible range of sentences. Defendant also asserts that he was denied his right to a fair sentencing hearing and to counsel when the trial court denied defendant's request for counsel. The State maintains that there is no merit to either of defendant's claims regarding his waiver of his right to counsel because the claims are contradicted by the record.

"It is well established that the sixth amendment to the United States Constitution guarantees an accused in a criminal proceeding both the right to the assistance of counsel and the correlative right to proceed without counsel." *People v. Haynes*, 174 Ill. 2d 204, 235 (1996) (citing *Faretta v. California*, 422 U.S. 806, 833-34 (1975)). "Because an accused who manages his own defense relinquishes many of the traditional benefits associated with the right to the

assistance of counsel, in order to represent himself the accused must knowingly and intelligently forgo those relinquished benefits." *People v. Kidd*, 178 Ill. 2d 92, 104 (1997) (citing *Faretta*, 422 U.S. at 835). "Although a defendant need not possess the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of such representation, so that the record will establish that ' "he knows what he is doing and his choice is made with eyes open." ' " *Kidd*, 178 Ill. 2d at 104 (quoting *Faretta*, 422 U.S. at 835, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). "The requirement of knowing and intelligent choice calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Kidd*, 178 Ill. 2d at 104-05 (citing *Patterson v. Illinois*, 487 U.S. 285, 292 (1988)). The trial court's ruling on a defendant's decision to represent himself at trial will only be reversed if the court abused its discretion. *People v. Shelton*, 401 Ill. App. 3d 564, 574 (2010).

Supreme Court Rule 401(a) dictates the trial court's procedure when a defendant waives his right to counsel. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). Rule 401(a) states:

> "(a) Waiver of Counsel. Any waiver of counsel shall be in
> open court. The court shall not permit a waiver of counsel by a
> person accused of an offense punishable by imprisonment without
> first, by addressing the defendant personally in open court,
> informing him of and determining that he understands the
> following:
>
> > (1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court."

Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

Compliance with Rule 401(a) is required for an effective waiver of the right to counsel; however, strict compliance is not necessary. *Haynes*, 174 Ill. 2d at 236. "[S]ubstantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." *Haynes*, 174 Ill. 2d at 236.

Here, the trial court complied with Rule 401(a). The record shows that on two occasions the trial judge tendered defendant written documents listing the charges pending against defendant and the possible sentences. On October 31, 2005, the trial court gave defendant a document listing all the charges stemming from four separate indictments and the possible sentences for all cases. The court continued defendant's case for a week to give defendant time to review the document before deciding to represent himself. At the next status date, defendant decided not to represent himself and to keep his attorney. A few months later in February 2006, defendant again indicated his desire to represent himself. When the trial court questioned whether defendant had received a written explanation of the charges, defendant acknowledged on the record that he had received an explanation. Then, the prosecutor stated on the record that defendant faced "58 years

minimum, 202 years maximum" on all pending cases.

Later in September 2006, following a mistrial, the State elected to try defendant on the instant case. Defendant was asked if he still wished to represent himself and he stated that he did. The State then presented defendant with a two-page document listing the charges in this case and the possible penalties, including consecutive sentences. The trial court advised defendant to read the document and to make notes of anything that he did not understand and ask questions at the next court date. Defendant never asked the court any questions about this document.

We point out that defendant is not contending that he did not understand the document or that he was unaware of the possible sentences he faced in the case. Rather, defendant claims that the trial court failed to comply with Rule 401(a) by not orally admonishing him about his potential sentences. However, defendant fails to cite any authority for his proposition that compliance with Rule 401(a) must be done orally.

We find that the trial court substantially complied with Rule 401(a). The trial court questioned defendant in open court about his desire to waive counsel and represent himself. Defendant was presented two times on the record with documents that informed him about all the charges pending against him and the possible penalties. He received a listing of all charges and sentences for several pending cases, and later, he received specific information of the charges and penalties for this case. The court told defendant to read and review the documents and advised him to ask questions about anything he did not understand. Defendant acknowledged receiving this documents on the record.

Moreover, the trial court went beyond the requirements of Rule 401(a) to make it clear that defendant knowingly and intelligently made the decision to waive counsel. The trial court

17

also warned defendant about the dangers of representing himself at trial against the State's trained prosecutors. Defendant was advised that the trial court could not teach him the law and could not act as his attorney, but defendant would still be expected to follow the same rules of evidence as other attorneys. Accordingly, we find that the trial court properly admonished defendant pursuant to Rue 401(a).

Likewise, we reject defendant's contention that the trial court erred in refusing defendant's request to appoint the public defender at sentencing or to grant a continuance to obtain private counsel. The trial court originally appointed an attorney to represent defendant in his posttrial proceedings, but defendant expressed his displeasure with his attorney's failure to file a posttrial motion containing the issues defendant felt were important by, among other things, calling his attorney names and describing him as "the worst attorney in the building." At a subsequent hearing, defendant continued to be abusive at future status hearings to his attorney and the trial court, yelling obscenities and throwing a file at the judge.

Defendant indicated on the record that he was filing multiple motions to halt proceedings, including an interlocutory appeal, an injunction, a motion to investigate the trial court's misconduct and multiple requests for a continuance to obtain private counsel, to prepare a motion for a new trial, to file a "rehearing" based on ineffective assistance of counsel. Defendant also asked for a public defender to represent him at the sentencing hearing, despite defendant having hired and fired the public defender multiple times before trial and after trial.

Defendant is correct that "a competent waiver of counsel by a defendant once made before the court carries forward to all subsequent proceedings unless defendant later requests counsel or there are circumstances which suggest that the waiver was limited to a particular stage of the

proceedings." *People v. Baker*, 92 Ill. 2d 85, 91-92 (1982). However, "we cannot countenance use of that right in a manner which appears calculated to 'thwart the administration of justice or to otherwise embarrass the effective prosecution of crime.' " *People v. Johnson*, 119 Ill. 2d 119, 135 (1987) (quoting *People v. Myles*, 86 Ill. 2d 260, 268 (1981)).

In *People v. Blaney*, 324 Ill. App. 3d 221 (2001), the defendant argued on appeal that he was denied his right to counsel when the trial court refused to appoint counsel at sentencing. The reviewing court detailed the defendant's cycle of firing attorneys and opting to appear *pro se* and then later requesting an appointment of counsel. *Blaney*, 324 Ill. App. 3d at 225-26. Similar to defendant in the present case, the defendant in *Blaney* filed a motion to represent himself at trial and then withdrew the motion. Then during jury selection, the defendant again requested to appear *pro se*, and the trial court granted the motion. After trial, defendant filed a motion for appointment of counsel and the trial court appointed an attorney. The defendant later told the trial court he wanted to dismiss his attorney because the attorney was ineffective. "The court informed defendant that he could choose to proceed *pro se* or with counsel but that defendant's lawyer-shopping was over and that the court would no longer appoint another attorney because defendant was dissatisfied with particular rulings. Defendant replied he wanted an 'effective' attorney and not the one appointed to him." *Blaney*, 324 Ill. App. 3d at 226. The defendant then requested a continuance to prepare, which the trial court denied. Two days before sentencing, the defendant again requested appointment of counsel, which the trial court denied because the defendant had already dismissed two attorneys and the defendant could not choose which hearings he would have representation and which hearings he would not. *Blaney*, 324 Ill. App. 3d at 226.

The reviewing court found that the trial court "had provided defendant enough in the way

of representation" and the defendant's refusal to accept the appointed counsel acted as a waiver of counsel. *Blaney*, 324 Ill. App. 3d at 226; see also *People v. Rivers*, 61 Ill. App. 3d 376, 386 (1978). The court concluded that the defendant's "request for 'effective' counsel was nothing more than a request to select from or experiment with appointed counsel to the detriment of the orderly process of law." *Blaney*, 324 Ill. App. 3d at 226.

Similarly, in the present case, defendant repeatedly asked to represent himself and then later requested counsel. After trial, defendant requested an attorney, which the trial court then appointed. Defendant later said he did not want his appointed counsel because counsel would not include defendant's claims in his motion for a new trial. Defendant said he did not want this attorney and wanted him relieved of all responsibility for defendant's case. Defendant continued to complain about this attorney at multiple court dates. Finally, on the day of the sentencing hearing, defendant asked for a continuance to obtain private counsel. The trial court found that defendant's motion was not in good faith and was an attempt to delay proceedings. Defendant dismissed his attorney on August 30, 2007, but did not make a request for private counsel until September 19, 2007. We note that in *People v. Ray*, 130 Ill. App. 3d 362, 368 (1984), the reviewing court found the defendant was dilatory in failing to make any effort to obtain counsel in the three weeks between proceedings. See also *Ungar v. Sarafite*, 376 U.S. 575, 590 (1964) (finding that a five-day continuance was not an inadequate amount of time to hire counsel). Given defendant's behavior and repeated hiring and firing of his attorney, we conclude that the trial court did not err in denying defendant's last-minute request for a continuance to obtain private counsel.

Defendant next asserts that the State failed to prove that he possessed a "firearm" as

required by the aggravated criminal sexual assault statute.  We note that defendant does not dispute that he sexually assaulted B.H. by placing his penis inside B.H.'s vagina and touching his penis to B.H.'s anus

When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant.  *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000).  Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.)  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001).  It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

It follows that where the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt. In conducting this inquiry, as noted, the reviewing court must not retry the defendant.  *People v. Cunningham*, 212 Ill. 2d 274, 279-80 (2004).  The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who saw and heard the witnesses.  *Cunningham*, 212 Ill. 2d at 280.  Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.  *Cunningham*, 212 Ill. 2d at 280.  However, the fact a judge or jury did accept testimony does not guarantee it was reasonable to do so.  Reasonable people may on occasion act unreasonably.  Therefore, the

21

fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. *Cunningham*, 212 Ill. 2d at 280. Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. *Hall*, 194 Ill. 2d at 330.

To prove aggravated criminal sexual assault, the State must prove that defendant committed criminal sexual assault while "armed with a firearm." 720 ILCS 5/12-14(a)(8) (West 2004). A violation of section 12-14(a)(8) of the Criminal Code of 1961 is a Class X felony for which an additional 15 years must be added to the sentence. 720 ILCS 5/12-14(d)(1) (West 2004). Here, the question relating to the additional fact, whether defendant was armed with a firearm, was specifically submitted to the jury with two separate verdict forms for each count of aggravated criminal sexual assault and the jury was instructed as follows to only sign the form if they concluded that the additional fact had been proven beyond a reasonable doubt.

> "[B]efore an additional fact alleged in connection with the offense
> of aggravated criminal sexual assault, defendant's penis to [B.H.'s]
> vagina, may be found to exist, the State must prove the following
> proposition: That at the time he committed the offense of
> aggravated criminal sexual assault, defendant's penis to [B.H.'s]
> vagina, the defendant was armed with a firearm.
>
> If you find from your consideration of all the evidence that
> the above proposition has been proved beyond a reasonable doubt,
> then you should return the verdict form stating that you find the

additional fact does exist. If you find from your consideration of all the evidence that the above proposition has been not been proved [*sic*] beyond a reasonable doubt, then you should return the verdict form stating that you find the additional fact does not exist."

The same instructions were repeated for the second count of aggravated criminal sexual assault, defendant's penis to B.H.'s anus.

The jury then concluded that defendant was armed with a firearm when he committed aggravated criminal sexual assault and signed the verdict form. Specifically, the verdict forms stated.

"We, the jury, find the fact does exist that, during the commission of the offense of Aggravated Criminal Sexual Assault, defendant's penis to [B.H.'s] vagina, the defendant was armed with a firearm."

"We, the jury, find the fact does exist that, during the commission of the offense of Aggravated Criminal Sexual Assault, defendant's penis to [B.H.'s] anus, the defendant was armed with a firearm."

Defendant contends that the evidence was insufficient to establish that he was armed with a firearm because "whether something is a 'firearm' depends on its technical specifications, how it is used, and how it is viewed by certain government entities."

Section 2-7.5 of the Criminal Code states that, "[e]xcept as otherwise provided in a specific [s]ection, 'firearm' has the meaning ascribed to it in [s]ection 1.1 of the Firearm Owners

23

Identification Card Act." 720 ILCS 5/2-7.5 (West 2004).

Section 1.1 of the Firearm Owners Identification Card Act (FOID Act) provides:

" 'Firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas; excluding, however:

(1) any pneumatic gun, spring gun, paint ball gun or B-B gun which either expels a single globular projectile not exceeding .18 inch in diameter and which has a maximum muzzle velocity of less than 700 feet per second or breakable paint balls containing washable marking colors;

(2) any device used exclusively for signalling or safety and required or recommended by the United States Coast Guard or the Interstate Commerce Commission;

(3) any device used exclusively for the firing of stud cartridges, explosive rivets or similar industrial ammunition; and

(4) an antique firearm (other than a machine-gun) which, although designed as a weapon, the Department of State Police finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon."

430 ILCS 65/1.1 (West 2004).

Defendant has not cited any case to support his position. Further, while the statutory definition does exclude some specific types of firearms, such as, BB guns, flare guns, and antique firearms, "firearm" is defined broadly. It includes "*any* device, *by whatever name known*, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas." (Emphasis added.) 430 ILCS 65/1.1 (West 2004).

We also find the circumstances present in this case to be similar to those present in *People v. Lee*, 376 Ill. App. 3d 951 (2007). In that case, the defendant approached a family leaving a liquor store. All of the victims testified that they saw the defendant in possession of a silver or chrome gun. One of the victims testified that she heard the defendant demand their money or he would shoot them. *Lee*, 376 Ill. App. 3d at 953. On appeal, the defendant contended that the evidence was insufficient to prove that he was armed with a firearm. The reviewing court disagreed, finding that "the circumstances described by the witnesses support the inference that defendant was armed with a gun." *Lee*, 376 Ill. App. 3d at 956. See also *People v. Coleman*, 345 Ill. App. 3d 1029, 1033 (2004) (upholding a conviction for armed robbery where the victim did not see the weapon used, but an object was placed against her throat and she received a cut and one of the robbers threatened to " 'cut' " her); *People v. Garcia*, 229 Ill. App. 3d 436, 437 (1992) (finding the evidence sufficient to support armed robbery conviction where the victim testified that she saw the gun and " 'it looked real' " and the defendant repeatedly threatened to shoot the victim). The *Lee* court also noted that the defendant's threats to shoot the victims was circumstantial evidence that he was carrying a firearm during the robbery. *Lee*, 376 Ill. App. 3d at 955.

Here, evidence was presented that defendant sexually assaulted B.H. while armed with a

gun. Both B.H. and Watkins-Lash testified that defendant had a gun. Watkins-Lash stated defendant came up to them "holding a gun cupped in his jacket, like the barrel of the gun. He had the gun out." Watkins-Lash further testified that the gun was in front of his face and pointed at the ground. When asked if he had any doubt that defendant had a gun, Watkins-Lash said, "[t]hat was a gun." B.H. also stated that defendant had a gun and she said he put it in his waistband when he led her to the gangway. Both victims stated that defendant threatened to kill them. While defendant sexually assaulted her, B.H. felt something pressed against her head. She believed that object was a gun because defendant was threatening to kill her. After viewing the evidence in the light most favorable to the State, we find that the jury could have concluded defendant was armed with a firearm when he sexually assaulted B.H.

Next, defendant contends that his convictions for attempted armed robbery should be reduced to attempted robbery because the State failed to prove that the weapon used was a "dangerous weapon." Defendant does not dispute that he attempted to rob B.H. and Watkins-Lash, but only that the evidence did not prove that he was armed with a dangerous weapon.

As we have already stated when reviewing a sufficiency of the evidence claim, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson*, 443 U.S. at 319; accord *Cox*, 195 Ill. 2d at 387. It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

To prove attempted armed robbery, the State was required to prove that "with intent to

26

commit [armed robbery], [defendant] [did] any act which constitutes a substantial step toward the commission of [armed robbery]." 720 ILCS 5/8-4(a) (West 2004). A person commits robbery when he takes property from the person or presence of another by the use of force or threatening the imminent use of force. 720 ILCS 5/18-1(a) (West 2004). Section 18-2(a) of the Criminal Code of 1961 (Criminal Code) sets forth the offense of armed robbery and provides:

"(a) A person commits armed robbery when he or she violates

Section 18-1; and

(1) he or she carries on or about his or her person or

is otherwise armed with a dangerous weapon other than a

firearm; or

(2) he or she carries on or about his or her person or

is otherwise armed with a firearm; or

(3) he or she, during the commission of the offense,

personally discharges a firearm; or

(4) he or she, during the commission of the offense,

personally discharges a firearm that proximately causes

great bodily harm, permanent disability, permanent

disfigurement, or death to another person." 720 ILCS 5/18-

2(a) (West 2004).

Here, defendant argues that the State failed to prove that he possessed a dangerous weapon. Defendant contends that "[t]o convict [defendant] of armed robbery, the prosecution was required to prove that [defendant] was 'armed with a dangerous weapon' at the time he

27

attempted to rob B.H. and Paul Watkins-Lash." Defendant cites to the indictments for these charges. The indictments alleged that defendant, "with intent to commit the offense of armed robbery, by use of force or by threatening the imminent use of force and while armed with a dangerous weapon, to wit: a gun" and referred to section 18-2 (720 ILCS 5/18-2 (West 2004)).

Defendant relies extensively on the supreme court's decision in *People v. Ross*, 229 Ill. 2d 255 (2008), to support his contention. In Ross, the defendant was convicted of armed robbery. The victim testified at trial that while he was walking late one evening, the defendant called to him while pointing a small gun at him and demanded the victim's wallet. The victim described the gun as " 'a black, very portable gun,' " " 'small,' " and " 'something you can conceal.' " *Ross*, 229 Ill. 2d at 258. After the defendant released the victim, the victim encountered police officers, who drove the victim back to the scene. There, they saw the defendant, who threw items into a bush when they approached. A police officer recovered the victim's wallet and a pellet, BB gun from the bush. *Ross*, 229 Ill. 2d at 258.

On appeal, the supreme court considered whether the BB gun was a "dangerous weapon" under section 18-2. The supreme court cited the decision in *People v. Thorne*, 352 Ill. App. 3d 1062 (2004), which noted that in previous cases in which guns incapable of firing bullets were deemed dangerous weapons, evidence was presented that the gun was either used in a dangerous manner or the character of the weapon was such it was capable of being used as a bludgeon. *Ross*, 229 Ill. 2d at 276 (citing *Thorne*, 352 Ill. App. 3d at 1072-73). The *Ross* court concluded that the evidence was insufficient to show that the BB gun was a dangerous weapon where the BB gun was not presented at trial and no evidence was presented that the gun was loaded, brandished as a bludgeon or as to its weight or composition. *Ross*, 229 Ill. 2d at 277. However,

28

1-07-2969

Ross was charged under a previous version of section 18-2 because the offense was committed in January 1999.

At the time of the armed robbery in *Ross*, the following version of section 18-2 was in effect.

> "Armed robbery. (a) A person commits armed robbery when he or she violates [s]ection 18-1 while he or she carries on or about his or her person, or is otherwise armed with a dangerous weapon." 720 ILCS 5/18-2 (West 1998).

The amended version of section 18-2 went into effect on January 1, 2000, and was in effect when the crime occurred in this case. This amendment to the armed robbery statute added subsection (a)(2), which deleted the requirement of proof of a "dangerous weapon" when the defendant is armed with a firearm. See 720 ILCS 5/18-2(a)(2) (West 2004). Thus, in *Ross*, the supreme court considered whether a BB gun was a "dangerous weapon" under section 18-2(a) (720 ILCS 5/18-2(a) (West 1998)).

Defendant contends that under *Ross*, the evidence was insufficient to show that he was armed with a dangerous weapon because the gun was not admitted at trial and the evidence did not show that the gun was loaded or used as a bludgeon. However, as the State points out, evidence of a dangerous weapon may be established through circumstantial evidence and an armed robbery conviction can be upheld even if the weapon was not seen nor accurately described by the victims. See *Lee*, 376 Ill. App. 3d at 955-56; *People v. Pryor*, 372 Ill. App. 3d 422, 430 (2007); *Coleman*, 345 Ill. App. 3d at1032-33.

The current statute, specifically section 18-2(a) makes clear that "dangerous weapon" and

29

"firearm" are two different offenses under different subsections. Section 18-2(a)(1) specifically excludes a firearm from the dangerous weapon subsection, stating "armed with a dangerous weapon *other than a firearm*." (Emphasis added.) 720 ILCS 5/18-2(a)(1) (West 2004). Section 18-2(a)(2), on the other hand, delineates the commission of armed robbery when "armed with a firearm." 720 ILCS 5/18-2(a)(2) (West 2004). Here, the State charged defendant under section 18-2, but did not specify under which subsection. The indictment alleged defendant was "armed with a dangerous weapon, to wit: a gun."

The defendant in *People v. Hill*, 346 Ill. App. 3d 545 (2004), raised the same argument as defendant does here. In that case, the defendant was charged with attempted armed robbery under section 18-2, stemming from an attempted robbery at the Prairie Pantry in Decatur, Illinois. Witnesses testified that the defendant had a chrome or silver automatic handgun with a long barrel. *Hill*, 346 Ill. App. 3d at 546-47. On appeal, the defendant asserted that the State failed to prove beyond a reasonable doubt that he was armed with a dangerous weapon because the gun he was carrying was inoperable. He relied on *People v. Skelton*, 83 Ill. 2d 58 (1980), which "held that the characteristics of a 'dangerous weapon' should be analyzed under an objective test to determine its true danger to others." *Hill*, 346 Ill. App. 3d at 547. However, the reviewing court noted that *Skelton* and other cases cited by the defendant were decided prior to the amendment to the armed robbery statute. *Hill*, 346 Ill. App. 3d at 548.

The *Hill* court then rejected the defendant's argument for three reasons. First, no evidence was presented that the gun was inoperable at the time of the attempted robbery. Second, the evidence was sufficient to show that the gun was capable of being used as a dangerous weapon, even assuming it was inoperable, as "[n]o evidence was introduced to suggest

30

that this gun was incapable of being used as a bludgeon-that it was either too small or too light to cause serious injury to anyone." Third, the court found that the evidence was sufficient to find the defendant guilty of attempted armed robbery under subsection 18-2(a)(2).

"As explained above, the recent amendment to the armed robbery statute added subsection (a)(2), which deleted the requirement of proof of a 'dangerous weapon' when the defendant is armed with a firearm." *Hill*, 346 Ill. App. 3d at 548-49. The reviewing court then looked at the definition of "firearm" for support.

The court in *Hill* found:

> "According to the above definitions, the focus is on the intended purpose of the firearm based upon its design, not the current status of its ability to be used as intended. As such, the evidence here, which indicated that defendant was armed with a 'nickel-plated automatic' handgun, was sufficient to qualify as a 'firearm' within the meaning of section 1.1 of the FOID Act despite defendant's contention that it was inoperable. Therefore, pursuant to section 18-2(a)(2) of the Criminal Code (720 ILCS 5/18-2(a)(2) (West 2000)), we find the trial court did not err in convicting defendant of attempt (armed robbery)." (Emphasis omitted.) *Hill*, 346 Ill. App. 3d at 549.

The court noted that even though the State did not allege a violation of this subsection in the charging instrument or rely upon the language of the amended section 18-2 on appeal, the court affirmed the defendant's conviction based on the record before them. *Hill*, 346 Ill. App. 3d

1-07-2969

at 549.

As in *Hill*, the record supports a finding that defendant was armed with a firearm. As we have previously discussed, both B.H. and Watkins-Lash testified that defendant had a gun. Watkins-Lash stated defendant came up to them "holding a gun cupped in his jacket, like the barrel of the gun. He had the gun out." Watkins-Lash further testified that the gun was in front of his face and pointed at the ground. When asked if he had any doubt that defendant had a gun, Watkins-Lash said, "That was a gun." B.H. also stated that defendant had a gun and she said he put it in his waistband when he led her to the gangway. Both victims stated that defendant threatened to kill them. While defendant sexually assaulted her, B.H. felt something pressed against her head, which she believed was a gun because defendant was threatening to kill her.

Since we have already affirmed the jury's finding that defendant was armed with a firearm when he sexually assaulted B.H., we conclude that the record in this case establishes beyond a reasonable doubt that defendant was armed with a firearm. The indictment charged defendant with armed robbery for being "armed with a dangerous weapon, to wit: a gun." Though the State did not specifically charge defendant under section 18-2(a)(2), it is the applicable section of the armed robbery statute when armed with a firearm. Accordingly, we affirm defendant's attempted armed robbery conviction on the record before us. See *Hill*, 346 Ill. App. 3d at 549 (citing *People v. Cox*, 202 Ill. 2d 462, 472 (2002) (a court of review can affirm on any basis supported by the record)).

Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

Affirmed.

32