# Illinois Official Reports

## Appellate Court

---

### *People v. Austin*, 2017 IL App (1st) 142737

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCUS AUSTIN, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-2737 |
| Filed<br>Rehearing denied | April 25, 2017<br>May 31, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 10-CR-21499, 10-CR-21500, 10-CR-21501; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jonathan Krieger, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Pierce and Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Marcus Austin was convicted by a jury of armed robbery, aggravated vehicular hijacking, and aggravated assault. He argues on appeal that (i) after a *Batson* challenge, the trial court improperly collapsed the three-step procedure, (ii) the trial court erred by refusing to instruct the jury on exclusions to the definition of "firearm," (iii) the prosecutor's closing argument improperly commented on Austin's silence at the time of his arrest, and (iv) the evidence to sustain his conviction for armed robbery was insufficient.

¶ 2     We affirm (i) the defense did not establish a *prima facie* showing of discrimination resulting from the State's peremptory challenges of two black venirepersons, (ii) the trial court's refusal of the defense's proffered instruction was not error because the jury instruction as given apprised the jury of the relevant law, (iii) taken in context and in its entirety, the prosecutor's closing argument was nothing more than a summation and not an improper comment on Austin's right to silence after his arrest, and (iv) the evidence proved beyond a reasonable doubt that Austin committed an armed robbery.

¶ 3                                    BACKGROUND
¶ 4                                    Jury Selection
¶ 5     During *voir dire*, the State used three peremptory challenges to exclude prospective jurors. Defense counsel challenged the State's peremptory removal of two black venirepersons. In addition, the State excused a third prospective juror, who was not black. Three black venirepersons were accepted to serve on the jury.

¶ 6     Without the defendant making a *prima facie* showing that the prosecution exercised peremptory challenges based on race, the trial court asked the State to provide race-neutral reasons for striking the two black jurors. The prosecutor pointed out that the defense had "not made a *prima facie* showing," to which the court replied, "I'm not sure they have either, but tell me the reason." The prosecutor then stated that one of the excluded venirepersons had a domestic battery conviction that he did not disclose (the venireperson had been arrested 19 years earlier for domestic battery and the charges were dropped). The prosecutor told the court the other black venireperson had "indicated several things that her brother [(actually, brother-in-law)] was a CPD police officer that was beat up by [Calumet] Park Police Officers. She says she reads the Bible. She says she is a youth minister. Those are all the reasons where the State struck her." The third juror stricken was not black but had four prior convictions. When the trial court asked defense counsel if he had anything else to argue, defense counsel responded, "No, Judge."

¶ 7     The State attempted to put on the record that the defense did not make a *prima facie* showing, to which the trial court replied, "I'm not saying that they did. We just went a little quicker to get that out of the way" and "I'm not accusing anybody of anything. It just makes it quicker to get it done. That's all. The reasons you gave I think are more than sufficient easily." The trial court reiterated that one had a prior conviction he did not disclose and the other "the situation with the police."

¶ 8     Moments later, the trial court stated, "I wasn't giving the parties a hard time about that race-neutral stuff. There is no issue in my mind that there was a *prima facie* case. I just jumped it forward to save a little time. There was no issue in my mind of any discrimination

whatsoever. So let's move on."

¶ 9                                              Trial

¶ 10      Austin and a codefendant were charged with aggravated vehicular hijacking of Takiyah Stephenson and armed robbery of Anthony Younger for taking money and a coat from Younger by threat or force while carrying a firearm. Before trial, the two defendants' cases were severed.

¶ 11      Around 11 p.m. on November 13, 2010, as Stephenson sat alone in the front passenger seat of her friend's car, a man approached and tried to open the locked driver's side door. The man asked Stephenson for a lighter and came around to the passenger side where the window was partially down. He stuck a gun through the opening, pointed it at her head, and told her to unlock the door. Stephenson grabbed the gun and "held it up." Another man (codefendant) approached on the driver's side with a gun and demanded that Stephenson unlock the door. She got out and ran. The two men took off in Stephenson's friend's car.

¶ 12      Stephenson testified the gun was steel but she could not describe the gun's make or whether it was automatic or semiautomatic. She knew it was a gun because her father was in the military and she had fired guns. On cross-examination, Stephenson admitted she could not tell the difference between a pellet gun and other guns.

¶ 13      Both Stephenson and the car's owner testified that a white jacket recovered from the car was not there before it was stolen.

¶ 14      About one-half hour later, Anthony Younger was robbed of money and a Pelle leather jacket. The day after the robbery, Younger described his jacket as a "cream-colored leather Pelle jacket." Younger testified that the jacket recovered from the car later was not his. Younger described the robber as black, in his twenties, and looking similar to Younger. He testified the robber had a gun; on cross-examination, he stated he did not know if the gun was real or a pellet gun and could have been a toy. Although Younger signed a lineup advisory form, he claimed he had not read it. After signing the form, Younger viewed a lineup but stated he did not pick anyone out. Younger did not identify Austin in court. The State impeached Younger with a prior conviction for a drug offense.

¶ 15      Chicago police detective Donald Hill testified that he interviewed Younger the morning after the robbery. Younger described his stolen jacket as a Pelle "white leather coat with studs on it." Hill explained the lineup advisory form to Younger; both Hill and Younger signed the form, and Younger identified Austin in the lineup.

¶ 16      Chicago police officer Thomas Raines was on patrol on November 13, driving a marked squad car with Chicago police officer Matthew Gozdal as passenger. Just before midnight, they saw a car matching the description of the stolen car and followed it. The car soon stopped, and two men got out and ran. Austin was on the passenger's side holding a black gun in his right hand, which looked to Raines like his own gun. Raines chased Austin, telling him to stop. While running, Austin pointed a gun at Raines. Raines fired at Austin eight times. Raines lost sight of him but 30 to 60 seconds later saw Austin in front of a nearby building. Raines identified Austin on the scene as the same man who had pointed a gun at him.

¶ 17      Gozdal, Raines's partner, testified he saw a black handgun in Austin's right hand as Austin ran. Gozdal pursued the driver and heard three gunshots.

¶ 18        Around 11 p.m., Chicago police officer Jose Pedraza and his partner received a "flash message" about a carjacking, including a description of the car and the license plate number. They pursued the car, which lost control and hit a curb. Two men jumped out and ran. Pedraza joined Raines and Godzal, who were chasing Austin. Pedraza saw a "blue steel handgun, semi-automatic pistol" in Austin's right hand. Austin turned and pointed the gun at Raines before Raines fired at Austin. At this point, Pedraza fell and lost sight of Austin.

¶ 19        Officer Brian Lohse arrived after the other officers had started to run after the car's occupants. Lohse encountered Austin, who put his hands in the air, saying, "I'm the guy you're looking for." Lohse handcuffed Austin and turned him over to Pedraza. No gun was found.

¶ 20        The defense presented no witnesses.

¶ 21        Closing Argument

¶ 22        During closing arguments, defense counsel argued that one of the elements of both offenses was that Austin had a firearm and then raised the possibility that the weapon seen by witnesses was a BB gun. Defense counsel argued that Stephenson admitted that she did not know the "differences of a gun" and had never shot a pellet gun. Defense counsel then theorized: "Where is the gun? What type of gun was it? Was it a real gun? Was it a BB gun[?] Those questions remain." Further, "I asked [Younger], can you describe the gun, can you tell me what kind it was, how big was it? He said he didn't know. Could it have been a toy gun? Yes, it could have been a toy gun."

¶ 23        In rebuttal, the State argued: "Now he wants you to believe that maybe that was a BB gun. If that was the case, wouldn't you want the officer to know, hey, it was just a gun, a BB gun, a toy, whatever, a starter pistol?" The trial court overruled defense counsel's objection. The prosecutor continued: "Wouldn't he want the officers to know that? But no. He hides it because he knows it's a real gun. He knows what the consequences are."

¶ 24        After arguments, defense counsel's motion for a mistrial was denied.

¶ 25        Jury Instructions

¶ 26        At the jury instruction conference, defense counsel requested Illinois Pattern Jury Instruction, Criminal, No. 18.35G (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 18.35G), defining "Firearm":

> "The word 'firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas. [The term does not include ____.]"

The committee note instructs to "[i]nsert in the blank the name or description of any gun or device excluded *** by subsections (1), (2), (3) or (4) of Section 65/1.1" and to "[u]se the bracketed material when appropriate." IPI Criminal 4th No. 18.35G, Committee Note.[1] The trial court refused to include in the instruction the language regarding exceptions.

---

[1]Defendant sought to include the following language in the jury instructions:

"(1) any pneumatic gun, spring gun, paint ball gun or B-B gun which either expels a single globular projectile not exceeding .18 inch in diameter and which has a maximum muzzle velocity of less than 700 feet per second or breakable paint balls containing washable marking colors;

¶ 27    The jury convicted Austin of armed robbery, aggravated vehicular hijacking, and aggravated assault. After a bench trial on an armed habitual criminal charge, the trial court found Austin guilty of the lesser-included charge of unlawful use of weapon (UUW) by a felon.

¶ 28    Austin was sentenced to concurrent prison terms of 30 years for armed robbery, 30 years for aggravated vehicular hijacking, 25 years for UUW by a felon, and 3 years for aggravated assault.

¶ 29                                    ANALYSIS

¶ 30    Austin raises four arguments that we address in procedural order as they occurred in the trial court before and during his trial.

¶ 31                                  Jury Selection

¶ 32    A prosecution's use of peremptory challenges to exclude prospective jurors based on race violates a defendant's right to equal protection under the fourteenth amendment. *Kentucky v. Batson*, 476 U.S. 79, 89 (1986). *Batson* established a three-step process for addressing alleged racially discriminatory use of peremptory challenges. *People v. Rivera*, 221 Ill. 2d 481, 500 (2006). First, *Batson* requires the trial court to determine whether the defendant has established a *prima facie* case of purposeful discrimination. *Id.* Once a *prima facie* case is shown, the State has the burden to articulate a nondiscriminatory, race-neutral explanation based on the facts of the case. *Id.* Then, considering the State's explanation, the trial court makes a final determination as to whether the defendant has shown purposeful discrimination. *Id.* Any ambiguities in the record will be construed against the party asserting the claim. *People v. Davis*, 231 Ill. 2d 349, 365 (2008).

¶ 33    The party attempting to exercise a peremptory challenge is not required to provide race-neutral reasons for the exercise of its peremptory challenge if a *prima facie* case of purposeful racial discrimination has not been demonstrated. *Batson*, 476 U.S. at 97. The burden of establishing a *prima facie* case of purposeful discrimination in jury selection is on the party making the *Batson* claim. *Rivera*, 221 Ill. 2d at 507. *Rivera* elaborated: "By definition, a '*prima facie* case' entails '[t]he establishment of a legally required rebuttable presumption' or '[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor.' " *Id.* (quoting Black's Law Dictionary 1228 (8th ed. 2004)).

¶ 34    Our supreme court has warned against collapsing a methodical procedure into an undifferentiated review of defense and State contentions. *People v. Garrett*, 139 Ill. 2d 189, 201 (1990) ("If the State were allowed to interrupt the *prima facie* hearing stage by obtaining judicial consideration of its explanations even though they would be insufficient to overcome an already established *prima facie* case, those explanations would constitute a thumb on the

---

(2) any device used for signaling or safety and required or recommended by the United State Coast Guard or the Interstate Commerce Commission;

(3) any device used exclusively for the firing of stud cartridges, explosive rivets or similar industrial ammunition; and

(4) an antique firearm (other than a machine-gun which, although designed as a weapon, the Department of State Police finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon."

scales that weigh the *prima facie* submission, which would undermine the very concept of a *prima facie* case as outlined in Batson.").

¶ 35    Austin argues the trial court improperly collapsed the three stages of his *Batson* inquiry after he challenged the State's use of peremptory challenges to strike two prospective black jurors from the venire. The State responds that Austin forfeited the issue, citing *People v. Jackson*, 357 Ill. App. 3d 313, 328 (2005), where this court found forfeiture after defendant failed to object and "by design" deprived the trial court of the opportunity to prevent or correct the error. Regardless of forfeiture, the State claims there was no impropriety in the hearing.

¶ 36    The trial judge stated there was "no issue in my mind" regarding "any discrimination whatsoever" and skipped the initial *prima facie* stage to "move things along." Had the factors relevant to a *prima facie* showing of discriminatory use of peremptory challenges been examined, the inquiry would have gone no further.

¶ 37    Our supreme court has articulated several relevant factors a trial court should consider in determining whether a *prima facie Batson* violation has been established, including (i) the racial identity between the party exercising the peremptory challenge and the excluded venirepersons; (ii) a pattern of strikes; (iii) disproportionate use of peremptory challenges; (iv) the level of black representation in the venire as compared to the jury; (v) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (vi) whether the excluded black venirepersons were a heterogeneous group sharing race as their only common characteristic; and (vii) the race of the defendant, victim, and witnesses. *People v. Williams*, 173 Ill. 2d 48, 71 (1996).

¶ 38    The record does not reflect that defense counsel relied on anything other than the number of peremptories used by the State against prospective black jurors, a relevant factor that standing alone is not sufficient to make out a *prima facie Batson* violation. See *People v. Garrett*, 139 Ill. 2d 189, 203 (1990) (number of black members of venire peremptorily challenged, without more, is insufficient to establish *prima facie* case of discrimination); see also *Rivera*, 221 Ill. 2d at 514 (pattern of discrimination not demonstrated "anytime a party strikes more than one juror of any race"); *People v. Shaw*, 2014 IL App (4th) 121157, ¶ 25 ("[W]hile evidence of a pattern of discriminatory strikes is one factor a court should consider when determining whether the party challenging the peremptory strike has established a *prima facie* case under *Batson*, it is not a dispositive factor.").

¶ 39    Further, "when a *Batson* claim is made regarding discrimination against a particular race, the unchallenged presence of jurors of that race on the seated jury is a factor properly considered [citations] and tends to weaken the basis for a *prima facie* case of discrimination." *Rivera*, 221 Ill. 2d at 513. Indeed, by the time defense counsel raised his *Batson* challenge, three black jurors had already been accepted by the State.

¶ 40    Given this circumstance, at a minimum, the trial court should have required Austin's counsel to articulate in more detail the basis for his *Batson* challenge. But, when given the opportunity to elaborate further, defense counsel declined. Failing a showing of factors other than the number of peremptories used against black members of the venire, there was no *prima facie* showing of a *Batson* violation and the State should not have been required to articulate any reason for striking those jurors.

¶ 41    Any error in a trial court's finding of a *prima facie* showing of a *Batson* violation is generally rendered moot by a later finding, as here, that no purposeful discrimination has occurred. *Id.* at 506 ("[W]hether a *prima facie* case of discrimination exists at the outset

becomes a moot point after the trial court finds valid and race-neutral reasons supporting the peremptory challenge \*\*\*.").

¶ 42 We have recognized that a *Batson* challenge raised in the middle of jury selection imposes a burden on the trial court and counsel. See *In re A.S.*, 2016 IL App (1st) 161259, ¶ 27 ("We recognize that this process interrupts jury selection, but it is the process that *Batson* requires."). Nevertheless, given the seriousness of a *Batson* challenge and the potential for depriving a defendant of a fair trial, strict adherence to *Batson's* mandate should be maintained. Because Austin failed to meet his burden to demonstrate a *prima facie Batson* violation, we reject his contention of error on this ground.

¶ 43 Jury Instruction

¶ 44 Austin argues the trial court committed reversible error when it denied his proposed instruction listing the gun types excluded in the statutory definition of "firearm." 720 ILCS 5/18-4 (West 2012). Citing *People v. Hari*, 218 Ill. 2d 275 (2006), Austin maintains the evidence at trial was sufficient to fulfill the requirement of "slight evidence upon a given theory of a case" and that the instruction as given was misleading on the key issue of identification of the weapon. The State asserts Austin "failed to preserve the issue," and besides, there was no evidence that the weapon used by Austin was anything other than a firearm. The two victims in their direct testimony stated that Austin used a gun. No weapon was recovered.

¶ 45 A defendant is entitled to an instruction on his or her theory of the case where some foundation for the instruction has been introduced in evidence. *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997) (citing *People v. Crane*, 145 Ill. 2d 520, 526 (1991)). We review *de novo* whether the instructions the jury received accurately conveyed the applicable law by determining whether the instructions "taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *People v. Parker*, 223 Ill. 2d 494, 501 (2006). We look to all the circumstances in deciding if defendant received a fair trial, " 'including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors.' " *People v. Layhew*, 139 Ill. 2d 476, 486 (1990) (quoting *Kentucky v. Whorton*, 441 U.S. 786, 789 (1979)).

¶ 46 A defendant forfeits the issue of jury instruction error unless he or she objects to the instruction or offers an alternative instruction and raises the instruction issue in a posttrial motion. See *People v. O'Neal*, 2016 IL App (1st) 132284, ¶ 77 (posttrial-motion requirement applies to challenge to jury instruction).

¶ 47 The State's argument that Austin did not preserve the issue fails. First, Austin proffered the full instruction. Second, his "Supplemental Defendant's Motion to Reconsider or For a New Trial" asserted that the trial court refused to give his proposed definition of a firearm.

¶ 48 Furthermore, the State contends that Austin made a different argument to the trial court than on appeal. While hypertechnical, contrary to the State's position, his argument does not significantly differ from the issue raised at trial; rather, it is a more efficient presentation of the pertinent sections of the proffered instruction.

¶ 49 We turn to the merits. During cross-examination, Stephenson testified that she could not tell the difference between a pellet gun and other guns, and Younger admitted that he did not know if the gun was real or a pellet gun and that what he saw could have been a toy. Based on

these answers, Austin claims he was deprived of his right for the jury to be instructed on the law that applied to the evidence in his case. He contends the trial court should have included in the definition of firearm specific items that do not meet the definition but which may appear, superficially, to be firearms. Instead, the instruction included the phrase "by expansion of gas or escape of gas" which would necessarily include a BB gun.

¶ 50    The IPI instruction defines "Firearm" as "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas. [The term does not include _____.]." IPI Criminal 4th No. 18.35G. The requested instructions are to be used "when appropriate." *Id.* The State relies on *People v. Wright*, 2015 IL App (1st) 123496, and *People v. Jackson*, 2016 IL App (1st) 141448, both finding eyewitness testimony that a defendant had a gun sufficiently established that a defendant used a firearm. In *Wright*, this court reversed the defendant's conviction of armed robbery on other grounds and thus did not decide the question of whether the trial judge's failure to give the instruction *sua sponte* was error where a BB gun was recovered with the victim's wallet. *Wright*, 2015 IL App (1st) 123496, ¶ 77. In *Jackson*, this court held that eyewitness testimony that the offender possessed a firearm, combined with circumstances under which the witness was able to view the weapon, sufficed to allow a reasonable inference that the weapon was actually a firearm, though no weapon was recovered. *Jackson*, 2016 IL App (1st) 141448, ¶¶ 16-18.

¶ 51    Stephenson's experience with guns and her opportunity to observe—the gun protruded through the car window pointing at her head and she grabbed the barrel and pushed it up—cannot be characterized as equivocal. On cross-examination she admitted she was not familiar with certain types of toy guns, but she did not waver in her testimony. Younger, a noncooperative witness, on direct examination testified the robber had a gun and only agreed with defense counsel when he suggested the gun Younger saw could have been a toy.

¶ 52                          State's Rebuttal Argument

¶ 53    Austin requests a remand for a new trial on the basis that the State's closing rebuttal argument improperly commented on his postarrest silence in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976).

¶ 54    A prosecutor has great latitude in closing arguments, including the right to comment on the evidence and reasonable inferences it yields. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). The prosecution also may respond to defense counsel when he or she invites or provokes a response and highlight inconsistencies in defendant's argument. *People v. Hodges*, 264 Ill. App. 3d 785, 788 (1993). Allegations of prosecutorial misconduct require us to review the arguments of both the prosecutor and defense counsel in their entirety and in context. See *People v. Tipton*, 207 Ill. App. 3d 688, 701 (1990).

¶ 55    Reversible error only occurs if the comments "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 53 (citing *People v. Nieves*, 193 Ill. 2d 513, 533 (2000)).

¶ 56    The defense's opening statement and closing argument drew attention to the State's lack of proof as to whether Austin possessed a firearm. During closing arguments, defense counsel argued that because neither eyewitness unequivocally stated that the item Austin was holding

was a real gun, the witnesses may have seen a BB gun, and not a firearm, a necessary element of the offenses against Austin.

¶ 57 On cross-examination, Stephenson admitted that she did not know the "differences of a gun" and had never shot a pellet gun. Defense counsel in closing theorized: "Where is the gun? What type of gun was it? Was it a real gun? Was it a BB gun[?] Those questions remain." Further, "I asked [Younger], can you describe the gun, can you tell me what kind it was, how big was it? He said he didn't know. Could it have been a toy gun? Yes, it could have been a toy gun."

¶ 58 In its rebuttal, the State argued: "Now he wants you to believe that maybe that was a BB gun. If that was the case, wouldn't you want the officer to know, hey, it was just a gun, a BB gun, a toy, whatever, a starter pistol?" Defense counsel objected, and the trial court overruled the objection. The prosecutor continued: "Wouldn't he want the officers to know that? But no. He hides it because he knows it's a real gun. He knows what the consequences are."

¶ 59 After closing arguments, the jury received an instruction that what the lawyers said during argument was not evidence and should not be considered as evidence.

¶ 60 As this court has stated repeatedly, the standard of review for error in closing arguments is unclear. *Sandifer*, 2016 IL App (1st) 133397, ¶ 55; *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 74. Our supreme court has employed both a *de novo* standard of review (*People v. Wheeler*, 226 Ill. 2d 92, 121 (2007)) and an abuse-of-discretion standard (*People v. Blue*, 189 Ill. 2d 99, 128 (2000)). Ultimately, the *Sandifer* and *Kelley* courts decided not to resolve the dispute regarding the appropriate standard of review as either standard leads to the same result. *Sandifer*, 2016 IL App (1st) 133397, ¶ 55; *Kelley*, 2015 IL App (1st) 132782, ¶ 76. Likewise, whether considering the State's closing arguments *de novo* or for an abuse of discretion, our holding is identical.

¶ 61 The State characterizes the prosecutor's remarks as a reference not to Austin's purported postarrest silence but instead "what he did not do or say during the commission of his crimes, prior to being arrested and given *Miranda* warnings." Officer Lohse testified he handcuffed Austin and turned him over to the other officers after Austin came out of the house and told him, "I'm the guy you're looking for." No evidence was presented at trial that Austin made any statements after being handcuffed, but Austin characterizes the prosecutor's comment as referencing his silence "during the entire investigation." This is an assumption we do not make. There is nothing to establish whether Austin exercised his right to silence after his arrest or he gave a statement of any sort.

¶ 62 Austin cites cases where error occurred when a prosecutor asked in closing argument why the defendant failed to tell the police about a defense. See *People v. Pegram*, 124 Ill. 2d 166 (1988) (prosecutor's cross-examination of defendant and comment on defendant's failure to offer exculpatory explanation at time of arrest or any time before trial were improper); *People v. Sanchez*, 392 Ill. App. 3d 1084 (2009) (where defendant did not testify, improper for State to elicit testimony from detective that defendant did not mention alibi); *People v. Moody*, 199 Ill. App. 3d 455, 464 (1990) ("Due process precludes a prosecutor from impeaching defendant's exculpatory testimony, offered for the first time at trial, by cross-examining defendant regarding his failure to inform police of his explanation after receiving Miranda warnings at the time of his arrest."). These cases are inapposite—all involved testimony referencing the defendants' postarrest silence and prosecutors' comments to the juries. The arresting officer testified only about what Austin said to him before he was handcuffed.

¶ 63    Austin cites *People v. Herrett*, 137 Ill. 2d 195 (1990), where the prosecutor's comments during rebuttal argument on the defendant's failure to testify and his postarrest exercise of his right to remain silent were improper but not so fundamental as to constitute plain error. *Id.* at 215. The prosecutor's comments pointedly referred to the absence of other testimony or evidence to explain the defendant's presence at the crime scene. *Id.* at 212.

¶ 64    Our review of the closing arguments in their entirety determines that the prosecutor's comments during rebuttal did not violate Austin's right to due process.

¶ 65                    Proof of Guilt Beyond a Reasonable Doubt

¶ 66    Finally, Austin contends that the State did not prove him guilty of armed robbery of Younger beyond a reasonable doubt. Austin argues that (i) the evidence as to the weapon used was contradictory, (ii) Younger did not identify Austin at trial, (iii) the physical evidence linking Austin to the robbery was nonexistent, and (iv) Younger's description of the offender was too generic. The State responds that the identification issues and physical evidence, or lack of it, were issues before the trier of fact. Moreover, Austin's argument "ignores a slew of evidence" corroborating the identification and establishing physical evidence.

¶ 67    The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences. *People v. Brown*, 2013 IL 114196, ¶ 48. When reviewing the sufficiency of evidence, we decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Evans*, 209 Ill. 2d 194, 209 (2004). We also resolve all reasonable inferences in the prosecution's favor (*People v. Bush*, 214 Ill. 2d 318, 326 (2005)) and may not substitute our judgment for that of the trier of fact regarding the weight of the evidence or the credibility of the witnesses. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). Unless the evidence is deemed so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt, we will not set aside a criminal conviction. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). Where the finding of the defendant's guilt depends on eyewitness testimony, we decide whether the fact finder could reasonably accept the testimony as true beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). "A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 68    Despite Younger's equivocal testimony, detective Hill's testimony established Younger identified Austin in a lineup the day after the robbery. And despite Younger's denial that it was his jacket in the stolen car, the recovered jacket matched the description Younger gave on the night of the robbery.

¶ 69    Arguably, the identity of the weapon was in dispute as no weapon was recovered. But, Carl Sagan's cliché "absence of evidence is not evidence of absence" applies to remind us that the jury heard three police officers testify that Austin had a "black" or "blue-steel" handgun in his right hand as he ran, in addition to both Stephenson and Younger who testified that Austin possessed a gun. Stephenson's and Younger's uncertainty regarding the possibility they saw a toy does not rise to the level of reasonable doubt.

¶ 70    Affirmed.