2021 IL App (1st) 171026-U

THIRD DIVISION
June 30, 2021

No. 1-17-1026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 19077 (01) |
| | ) | |
| LEONDO JOSEPH, | ) ) | Honorable Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Affirmed. Defendant did not receive *per se* ineffective assistance of counsel when non-lawyer, *pro se*, codefendant brother conducted his direct examination at joint trial; because defendant was called as witness in codefendant's case, codefendant was not representing defendant. Evidence sufficient to prove that codefendant, for whom defendant was accountable, was armed with a firearm.

¶ 2   A jury convicted defendant Leondo Joseph, and his codefendant and brother, LB Joseph, of aggravated kidnapping, aggravated criminal sexual assault, and aggravated battery. The jury also found that LB, for whom Leondo was accountable, was armed with a firearm during the kidnapping and sexual assault.

¶ 3   Codefendant LB has filed his own appeal and is not a party to this one. See *People v. LB Joseph*, 2021 IL App (1st) 170741. Here, defendant Leondo contends that he received *per se*

ineffective assistance of counsel when his non-lawyer, codefendant brother conducted his direct examination at their joint jury trial, a proceeding at which Leondo, having waived his right to counsel, otherwise represented himself. (As did LB). Defendant also argues that the testimony of the victim, L.D., was not sufficient to prove beyond a reasonable doubt that codefendant LB was armed with a firearm. For the reasons that follow, we affirm.

¶ 4                                         BACKGROUND

¶ 5      Defendant Leondo and codefendant LB waived their respective rights to counsel. They were tried jointly, before a single jury. Each defendant represented himself, making his own closing argument (defendant Leondo waived his opening statement) and conducting his own cross-examination of the State's witnesses, among other things.

¶ 6      The key witness for the State, particularly for our purposes here, was L.D., the victim of the charged offenses. L.D. testified that she was approached by the defendants on the night of December 17, 2011, while waiting for a bus on a street corner. L.D. gave conflicting accounts of exactly which corner it was, but she was clear that the encounter began late at night, sometime around midnight, when a car pulled up and stopped in front of her.

¶ 7      The driver, codefendant LB, rolled down the window to talk to L.D., but she ignored him. LB then got out of the car. He was holding a gun at his side. He walked toward L.D. and said that she had "two options, get in the car or get shot."

¶ 8      L.D. did not know what kind of gun it was. As a general matter, she explained, she "don't know nothing about no guns." As best she could recall, it was not silver or blue steel. By the time of trial, she could not remember whether it was a revolver.

¶ 9      Scared for her life, L.D. got into the front passenger seat. Codefendant LB drove around for "a long time" before eventually parking in an alley. Along the way, L.D. noticed defendant

Leondo in the back of the car.

¶ 10    The defendants told L.D. to get into the back seat and take off her clothes. She complied. Over the next several hours, until 8 a.m. or so, the defendants took turns forcing L.D. to perform oral, vaginal, and anal sex. When she tried to escape, defendant Leondo punched her in the face, below her right eye. Before the trial, she had told the police it was below her left eye.

¶ 11    Sometime after daybreak, another car drove into the alley. The defendants told L.D. to get dressed and let her out of the car at the end of the alley. She went into a nearby business, said she was just raped, and asked to call the police. She was taken directly to the hospital in an ambulance, where she reported that she had been raped orally, vaginally, and anally.

¶ 12    Swabs were taken from L.D.'s mouth, vagina, anus, and underwear. Semen was detected in every sample and there was blood in the underwear sample. Although the DNA analysis was not conclusive, it did show, in sum, that neither of the codefendants could be excluded from the sperm fractions identified in the oral, anal, and underwear samples. The vaginal sample matched defendant Leondo but not codefendant LB.

¶ 13    The State also offered other-crimes evidence to show propensity, *modus operandi*, and lack of consent. Another complainant, D.K., testified to an unrelated incident in which she was abducted off the street and forced to perform oral and vaginal sex on Leondo in the back seat of the defendants' car. LB stood by, waiting for his "turn" (as he called it) with his pants down, only to be interrupted by an approaching police car.

¶ 14    After the State rested, the trial court asked each defendant separately whether he had any evidence or witnesses to present. The court started with LB, who called Leondo to the stand.

¶ 15    Defendant Leondo testified that he was driving with LB, in an area known for drugs and prostitution, when he saw L.D. standing on a street corner. They pulled up and talked to her. L.D.

said that "she was out there dating" and that her pimp "got a little rough with her." After talking

and smoking a cigarette together, Leondo offered L.D. $100 for sex. She got into the backseat of

the car willingly and Leondo drove off.

¶ 16    At first, Leondo testified that his brother got out of the car after they parked. He later

testified that he dropped LB off at a friend's house along the way. In any event, Leondo and L.D.

had oral and vaginal sex, but not anal sex, in the back seat. It was consensual, no force was ever

used, and LB did not participate at all.

¶ 17    Afterwards, L.D. demanded more money. When Leondo refused, L.D. grew angry, got

out of the car, and slammed the door.

¶ 18    Leondo denied that he had a gun or a knife with him during the encounter. He further

testified, in sum, that D.K. was also a prostitute, whom he paid $20 for oral sex.

¶ 19    LB did not call any more witnesses and rested his case after Leondo testified. The trial

court then asked Leondo if he wished to call any witnesses. Leondo said no and rested.

¶ 20    After the jury returned its verdicts, the trial court sentenced defendant to 147 years in

prison. That was the minimum sentence allowed by the confluence of consecutive-sentencing

provisions and 15-year firearm enhancements that applied to the aggravated kidnapping and six

aggravated criminal sexual assault convictions (two counts each of oral, vaginal, and anal

penetration—one committed by defendant himself, and one by LB, for whom defendant was

accountable). "These are strange sentencing laws," the trial judge lamented, but he lacked any

discretion to depart downward from the *de facto* life sentence they generated.

¶ 21                                    ANALYSIS

¶ 22                            I. Ineffective assistance of counsel

¶ 23    Codefendant LB called defendant Leondo to the stand and questioned him on his direct

examination. To this extent, defendant argues, he was represented by LB, albeit temporarily, during a critical stage of the proceedings. And because LB was not a licensed attorney, he must be deemed *per se* ineffective. *People v. Allen*, 220 Ill. App. 3d 772, 781 (1991). On this basis, defendant thus claims he was denied his sixth amendment right to the effective assistance of counsel—notwithstanding his waiver of counsel and exercise of his right to self-representation throughout the rest of the joint trial.

¶ 24 The record rebuts defendant's contention. After the State rested, the trial court explained how the defense cases, if any, would proceed. The court would ask each defendant separately if he had any evidence that he wanted to present, and after each defendant finished presenting his evidence, the court would ask that defendant whether he would rest at that time. The court began with LB, who sought to introduce various pieces of documentary evidence that we need not discuss in any detail here.

¶ 25 When that discussion concluded, LB indicated that he was ready to proceed with his case. But the State interjected that, as it understood the defendants' intentions, "Mr. LB Joseph will be calling Mr. Leondo Joseph as a witness," and so Leondo "need[ed] to waive his right against self-incrimination." The trial court responded that defendant Leondo waives the privilege by testifying and asked him whether he understood that "there is going to be cross-examination." Leondo answered, "I don't care."

¶ 26 The trial court then formally asked, in the presence of the jury, "Do you wish to present any evidence, LB Joseph?" LB replied, "Other than the evidence I mentioned before the jury's appearance, your Honor." The court followed up by asking LB, "Do you have any witnesses you wish to call?" LB answered, "Mr. Leondo Joseph to the stand."

¶ 27 Defendant Leondo took the stand. He was questioned by LB on direct, cross-examined by

the State, and questioned again by LB on redirect. After defendant testified, the trial court asked, "Any other witness you with to call, Mr. LB Joseph?" LB said no and rested. The trial court then asked defendant Leondo if he wished to call any witnesses. He said no and rested.

¶ 28    The record thus shows that LB was not representing defendant during direct examination. Rather, as a *pro se* litigant, LB was examining a witness he had called in his own (that is, LB's) case. LB, in other words, was representing himself; defendant was his witness, not his "client," as it were. Thus, the *per se* rule that defendant invokes does not apply here, and his novel claim that he was denied the effective assistance of counsel, even after waiving counsel, fails.

¶ 29    Whatever grasp of the proceedings the *pro se* defendants may (or may not) have had, the simple and dispositive fact remains that Leondo was called to the stand as a witness in LB's case. The State aptly makes this point, and in the face of the record, defendant is powerless to dispute it. Instead, in his opening brief, he points out that he did not testify "in the narrative form" or present "his own questions and answers to the jury by himself."

¶ 30    Of course he didn't. Defendant was called as witness in LB's case. And that is why he testified in the manner of an ordinary witness, namely, by answering questions put to him by his codefendant's counsel, or as it happened here the codefendant himself, *pro se*. Thus, the fact that defendant did not testify in the *pro se* manner does not establish that LB was temporarily representing him. Defendant was still a *pro se* litigant—and his codefendant brother's witness.

¶ 31    In his reply brief, defendant appears to acknowledge that he testified in his codefendant's case in chief. But he did not "merely" do that. He *also*—and at the same time—testified on his own behalf, or so he claims. And thus LB, having taken the wheel during his direct examination, was, in "reality," representing him.

¶ 32    It is true, as defendant says in this context, that the trial court did not instruct the jury to

consider his testimony only in determining LB's guilt. And once testimony or other evidence is admitted, the jury is free to consider it for any relevant purpose that is not precluded by a limiting instruction from the court. Thus, the jury was also free to consider defendant's testimony as to the charges against *him*, not just LB.

¶ 33    But what does that show? That defendant had every right to invoke his privilege against self-incrimination and refuse to testify in LB's case, if he did not wish to. (He makes no such claim.) It does *not* show that defendant's waiver of counsel momentarily lapsed, and that his representation was temporarily put into LB's (*per se* deficient) hands, when he agreed to testify as a witness in LB's case.

¶ 34    One final point. We reject defendant's seeming implication that the trial court had a duty to give a limiting instruction, seat separate juries, or otherwise ensure, on its own initiative, that defendant's testimony could not be considered as to charges against him. The trial court was not his advocate. And defendant may have *wanted* the jury to consider his testimony—elicited though it was in LB's case, by his codefendant's inartful questioning—when deliberating about his own guilt. If he did not, it was his burden to say so. It was not the trial court's duty, or even its prerogative, to unilaterally decide these questions of strategy for him.

¶ 35                                II. Firearm enhancements

¶ 36    L.D. testified that codefendant LB approached her while carrying a gun at his side and said that she had "two options, get in the car or get shot." Based entirely on this testimony, the jury found that LB, for whom defendant was accountable, was armed with a firearm during the kidnapping and six distinct acts of sexual assault that followed. Defendant was thus subject to seven consecutive 15-year firearm enhancements, increasing his mandatory minimum sentence by an additional105 years.

¶ 37 Defendant claims this finding was error. He says the uncorroborated testimony of L.D.— who could not describe the gun, and who, in her own words, "don't know nothing about no guns"—was not sufficient to prove beyond a reasonable doubt that he was carrying a real firearm, rather than a toy or other look-alike.

¶ 38 If defendant's sufficiency challenge is to succeed, he must show that L.D.'s testimony was so "unreasonable, improbable, or unsatisfactory" that no rational trier of fact, viewing it in the light most favorable to the State, could accept it as proof beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008); see *Jackson v. Virginia*, 443 U.S. 307 (1979). The trier of fact's findings regarding the credibility of witnesses and the inferences to be drawn from the evidence are not conclusive, but they are entitled to significant deference. *Ross*, 229 Ill. 2d at 272.

¶ 39 For the enhancements to apply, the State had to prove that codefendant LB was "armed with a firearm." 720 ILCS 5/10-2(a)(6) (West 2011) (aggravated kidnapping); *id.* § 11-1.30(a)(8) (aggravated criminal sexual assault). Unless a specific provision states otherwise, the term "firearm," when used in the Criminal Code, "has the meaning ascribed to it in Section 1.1 of the Firearm Owners Identification Card (FOID) Act." *Id.* § 2-7.5.

¶ 40 The FOID Act defines a firearm as follows: "[A]ny device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas," but excluding, among other items, pneumatic, spring, paint ball, and BB guns, and certain antique firearms. 430 ILCS 65/1.1 (West 2011).

¶ 41 Because the term "firearm" bears this "technical" meaning, defendant argues, the State must prove that an alleged firearm was designed to expel projectiles of a relevant type in one of the specific "manners" listed in the definition. Direct evidence of the design and functionality of

the alleged firearm is necessary to rule out the possibility that it was a just BB gun, for instance, or some other type of "gun" that the statutory definition of a firearm specifically excludes.

¶ 42    This burden of proof would easily be satisfied when a witness with a working knowledge of firearms can inspect the device in question. And presumably it would be satisfied by evidence that the defendant used the device to "expel a projectile" of a relevant type during the offense.

¶ 43    But in this case, and in countless others like it, the alleged firearm was neither discharged nor recovered, so the only relevant evidence is an eyewitness's testimony that the defendant had a gun. Defendant argues that such "conclusory" testimony generally cannot prove beyond a reasonable doubt that the gun was a real firearm, as defined by the FOID Act.

¶ 44    After all, he says, appearances often deceive. Not everything that looks like a real firearm turns out, upon inspection, to be one. So much so that even "trained police officers" mistake BB guns or other toys for real firearms when sizing them up on the fly, as a host of tragic cases cited by defendant reminds us. Even less can we expect the average witness, lacking training and experience with firearms, to reliably distinguish a real one from a realistic toy—and to do so, no less, based on whatever observations the witness can muster as the gun is brandished during a criminal offense.

¶ 45    Defendant's concerns are not unreasonable. In real time, it can be difficult indeed to distinguish real firearms from, say, air guns—especially the air guns that are selected for use in coercive criminal acts, "where they would lose most of their efficacy" if they were recognized for what they really are. *United States v. Bey*, 748 F.3d 774, 777 (7th Cir. 2014).

¶ 46    That said, our supreme court has held that such eyewitness testimony *can* prove beyond a reasonable doubt that a defendant possessed a real firearm. The clearest example of this holding from our supreme court is *People v. Wright*, 2017 IL 119561. The issue in *Wright* was whether

the codefendant "possessed a firearm as defined by the FOID act." *Id.* ¶ 39. Because the alleged firearm was neither discharged nor recovered, the only evidence that it was a real firearm came from the witnesses who saw it during the armed robbery and testified that they "believed" it was, or that it "looked like," a semiautomatic handgun. *Id.* ¶ 76. That testimony alone was sufficient evidence that the codefendant possessed a firearm. *Id.* ¶ 39.

¶ 47    In reaching that conclusion in *Wright* (*id.* ¶ 76), the supreme court took the "rationale" of *People v. Washington*, 2012 IL 107993, to be "controll[ing]." In *Washington*, the victim testified, in sum, that the defendant pointed "a gun" at him and forced him into a truck, where the "gun" was then held to his head. *Id.* ¶ 35.

¶ 48    It is true, as defendant notes here, that the precise question in *Washington* was whether there was sufficient evidence of a "dangerous weapon," a broader statutory category than "firearm." *Id.* ¶¶ 1, 5-7; see 720 ILCS 5/33A-1(c). But the supreme court expressly found that "the jury could reasonably infer" from the victim's testimony that "defendant possessed *a real gun*." (Emphasis added.) *Washington*, 2012 IL 107993, ¶ 36.

¶ 49    In so finding, the supreme court rejected the defense argument that because the gun was not recovered, "it could not be known for sure whether the gun was real or a toy." *Id.* And if the victim's testimony was sufficient to prove beyond a reasonable doubt that the "gun" was real, it was sufficient to prove not only that the "gun" was a dangerous weapon, but also that the "gun" was a firearm, within the meaning of the FOID Act. *Id.*; see *Wright*, 2017 IL 119561, ¶ 76.

¶ 50    Our supreme court's latest word on this topic came in *People v. McLaurin*, 2020 IL 124563, issued after defendant filed his opening brief. Defendant thus relied on the appellate opinion in *McLaurin*, 2018 IL App (1st) 170258, in which we reversed the trial court's finding that the defendant possessed a firearm—only to be reversed, in turn, by the supreme court.

¶ 51    In *McLaurin*, an officer saw the defendant walk out of a building carrying a silver or chrome handgun. *Id.* ¶¶ 3, 5. She had an unobstructed view, from about 50 feet away, in the middle of the day. *Id.* But the defendant was holding the gun by the barrel, so she could not tell what kind of gun it was, or even whether it was a revolver or a semiautomatic. *Id.* ¶ 6.

¶ 52    In our appellate decision, we took the trial court's finding to be based entirely on the "circumstantial evidence" provided by this officer's testimony; and we found that her testimony, on its own, did not prove beyond a reasonable doubt that the item she saw satisfied the specific criteria set forth in the statutory definition of a firearm. *Id.* ¶¶ 22, 24, 28.

¶ 53    In reversing our judgment, the supreme court reiterated that under *Washington* and *Wright*, circumstantial evidence alone, in the form of eyewitness testimony, can prove that a defendant is armed with a firearm. *McLaurin*, 2020 IL 124563, ¶¶ 17, 24-31. The supreme court also cast doubt on the conclusion that this particular officer's testimony would not suffice, on its own, to sustain the trial court's judgment. See *id.* ¶¶ 35-36. But the supreme court did not have to answer that question definitively, because the officer's testimony was not the only evidence that supported the judgment.

¶ 54    After the defendant in *McLaurin* left the building, carrying a supposed handgun, he got into a van, which was stopped and searched a few minutes later. *Id.* ¶¶ 4-9. The officers did not find a gun inside the van or on any of the occupants, but they did find one directly underneath the van; and it matched the general description, in terms of size and color, of the supposed handgun that the defendant was seen carrying into the van. *Id.* ¶ 6-8. Thus, it was reasonable to infer that it was the same handgun. See *id.* ¶ 37. And although the State chose not to introduce the handgun into evidence, the officer who found it did testify that it was a loaded .9 millimeter, from which he removed a magazine and found another bullet in the chamber. *Id.* ¶¶ 8, 32.

¶ 55　　To this extent, the evidence in *McLaurin* was different in kind than the evidence in *Washington*, *Wright*, or this case. The officer who found the gun in *McLaurin* did not merely see it in someone's hand; he held it in his own hands and verified that it was loaded with bullets—not with BBs or pellets or whatever else. That is direct, rather than circumstantial, evidence that the gun was a real firearm. And it should be proof enough for any reasonable trier of fact.

¶ 56　　On a close reading of its facts, *McLaurin* does not (because it was unnecessary to) squarely answer the question defendant has put to us: Whether an eyewitness who sees an apparent gun in a defendant's hand can provide sufficient evidence that it was a *firearm*, and not something that merely *looked like* a firearm. *Washington* and *Wright*, however, do answer that question head-on, and *McLaurin*, if nothing else, leaves those holdings undisturbed.

¶ 57　　Together, these cases tell us that defendant sets the bar too high. To prove beyond a reasonable doubt that a defendant was armed with a firearm, the State generally does not need to offer direct evidence of the alleged firearm's "design" or its precise method of expelling projectiles, as defendant would have us require. And a single witness, with no training, experience, or knowledge of firearms, is enough. The witness need not provide any meaningful description of the gun. Nor, for that matter, does any witness need to see the whole gun, much less see it for more than a brief moment or from a favorable vantage point.

¶ 58　　True, in *Washington*, *Wright*, and the appellate decisions cited by the State, the testimony had at least *some* feature(s) along these lines to (arguably) bolster its claim of reliability. *Wright*, 2017 IL 119561, ¶¶ 9,12 (multiple witnesses, some claiming firearms experience; description of gun); *Washington*, 2012 IL 107993 ¶ 35 (arguably better vantage point, more time to observe); *People v. Toy*, 407 Ill. App. 3d 272, 293 (2011) (multiple witnesses); *People v. Lee*, 376 Ill. App. 3d 951, 953 (2007) (multiple witnesses; description of gun).

¶ 59    In contrast, L.D.'s testimony about the gun exhibited no such features. For this reason,
defendant argues, it was simply too thin and unreliable to prove beyond a reasonable doubt that
codefendant LB was armed with a firearm. And that is particularly so, he claims, when L.D.
conceded that she knew nothing about guns.

¶ 60    But her testimony on that last point bears further scrutiny. This was the exchange on
cross-examination that yielded that statement:

> "Q.  What type of gun was it?
>
> A. I don't know nothing about no guns, so I don't know what kind of gun it was."

¶ 61    There is a difference, in our view, between not being able to recognize a gun as a gun, on
the one hand, and not being able to distinguish between a Glock versus a Ruger, a 9 millimeter
versus a .44 Magnum, or a semi-automatic versus an automatic. L.D.'s answer was that she could
not tell the *type* of gun, which puts her in company with a fair number of citizens of this state
who lack this level of familiarity with firearms.

¶ 62    Indeed, L.D.'s testimony in that regard is not different from the victim in *Washington*,
2012 IL 107993, ¶¶ 10, 35-36, who did not describe the gun in the slightest—he simply declared
that it was a "gun"—nor did he claim to know the first thing about guns. Yet the supreme court
found that his testimony was proof beyond a reasonable doubt that the defendant was carrying "a
real gun." *Id.* ¶ 36. It would be inconsistent with our supreme court precedent to hold that only
witnesses who understand the finer points of firearms are able to distinguish between a real gun
and a fake one.

¶ 63    We would add here a couple of points. First, L.D. did not merely see the handle of the
weapon or see it only in the flash of an instant; she saw defendant get out of the car and walk
toward her while holding the gun:

- 13 -

"Q. What, if anything, did you notice when he got out of the car and came toward you?

A. A gun.

Q. And where was that gun?

A. On his side. He had it in his hand.

\*\*\*

Q. And when you saw that person approaching you with the gun what happened?

A. He approached me with the gun. He walked to me and told me I got two options, get in the car or get shot."

¶ 64     The evidence did not pin down the precise window of time that passed. It would appear to be not particularly long, but it certainly was more than an instantaneous glance. Indeed, L.D.'s testimony indicated that codefendant LB threatened her with the weapon, indicating that he was not shy about calling it to her attention; he at least wanted her to believe it was a real gun.

¶ 65     Which leads into our final point—the fact that codefendant LB threatened her with the weapon. A defendant's threat to shoot a victim is circumstantial evidence that he was armed with a firearm. *Lee*, 376 Ill. App. 3d at 956; *cf. Toy*, 407 Ill. App. 3d at 289 (threat to kill victim was circumstantial evidence defendant armed with firearm); *People v. Garcia*, 229 Ill. App. 3d 436, 439 (1992) (threat to shoot victim was circumstantial evidence defendant armed with dangerous weapon).

¶ 66     True, codefendant LB could have been faking it, so to speak—threatening to shoot her with something that was not actually a firearm but rather an air gun or similar dangerous weapon that does not qualify as a firearm. But that is not its most natural and ordinary meaning, nor is it the interpretation most favorable to the State. Viewed in that light, a rational trier of fact could

(and probably would) take it as a threat to "shoot" L.D. in the usual sense of the term—with a gun, a real gun, and hence, with a firearm.

¶ 67　　In sum, we must acknowledge the standing "possibility" that L.D. "saw a toy," but such possibilities alone, as we said in *People v. Austin*, 2017 IL App (1st) 142737, ¶ 69, do not "rise to the level of reasonable doubt." The evidence that codefendant LB was armed with a firearm, as defined by the FOID Act, was far from overwhelming. But it was sufficient. A rational trier of fact could draw this inference from L.D.'s testimony that he had a gun and threatened to shoot her if she did not get into the car.

¶ 68　　We thus reject the challenge to the sufficiency of the proof.

¶ 69　　　　　　　　　　　　　　　CONCLUSION

¶ 70　　The judgment of the circuit court is affirmed.